# GREGORY NEAL LEACH *v.* STATE OF MARYLAND

[No. 633, September Term, 1980.]

*Decided February 5, 1981.*

612

The cause was argued before MORTON, LISS and WEANT, JJ.

*Patrick D. Hanley, Assigned Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Sam Brave, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

Gregory Neal Leach, appellant, was charged with murder and tried before a jury in the Criminal Court of Baltimore. The jury was unable to agree upon a verdict and a mistrial was granted. Appellant was thereupon tried a second time and on April 2, 1980, was convicted by a jury of first degree murder. The presiding judge imposed a life sentence and from that judgment, defendant appeals. Appellant raises nine issues to be decided by this Court:

I. Did the trial court err in prohibiting appellant from using an inculpatory statement of a third party in his defense?

II. Did the trial court err in admitting into evidence statements made by appellant to Los Angeles, California police officers?

III. Did the trial court err by refusing to strike a juror who was a former schoolmate and neighbor of a state's witness?

IV. Did the trial court err in refusing to grant a short continuance to allow appellant to be examined by a medical doctor for a stomach disorder?

V. Did the trial court err in refusing to grant a mistrial for misconduct by the State?

VI. Did the trial court err in refusing to grant appellant's requested instructions on malice and the weight to be given police testimony?

VII. Did the trial court err by allowing the jury to be separated and return to their homes after they had started their deliberations?

VIII. Did the trial court abuse its discretion in reading unrequested portions of appellant's testimony to the jury?

IX. Did the trial court err by denying appellant's motion for a judgment of acquittal because the evidence was insufficient?

We believe that a brief recitation of the facts of this case will be useful in placing the legal issues in proper perspective. On March 9, 1979, the police discovered the badly decomposed body of Essie May Robinson, appellant's mother-in-law, at 20 North Morley Street in Baltimore City, where appellant resided at the time. An assistant State medical examiner determined that the deceased had died from multiple stab wounds. Approximately one week after the discovery of the body, an unidentified male approached Officer Keith Teidemann and told him that one Rochelle West, who lived at 8 North Morley Street, had approached him and said she needed money to get out of town because she had killed somebody on Morley Street. This information was related to a detective on the homicide unit who prepared a report (apparently erroneous) in which he stated that the information had been given to Officer Teidemann by Rochelle West herself. The report was then relayed to an officer who had been assigned to investigate the homicide at 20 North Morley Street.

At trial, Officer David Enlow of the Los Angeles Police Department testified that on March 26, 1979, while on duty, appellant approached him and stated, "Officer, I am in big trouble, I killed my wife's mother." Officer Enlow thereupon placed appellant under arrest and detained him in a police cruiser. Officer Carlo Greco, Enlow's partner, testified that while transporting appellant to the police station appellant told him that he had cut the victim in Baltimore and that she was living at 20 North Morley Street. Upon arrival at the police station, appellant furnished his name, date of birth and other statistical information. Officer Greco then telephoned the Baltimore City Homicide Unit and upon learning that appellant was wanted in Baltimore, he administered the *Miranda* rights to appellant. No additional statements were made by appellant to the Los Angeles Police.

## I.

Prior to the beginning of the trial, the State filed a motion in limine to prohibit the defense from producing any testimony concerning the alleged statement by Rochelle West and to preclude the defense from using the statement for impeachment purposes. The trial judge's decision to grant the State's motion is the subject of the first issue on appeal. Assuming the question is before us, we [1] find no error in this ruling. Appellant relies on *Jacobs v. State,* 45 Md. App. 634, 415 A.2d 590 (1980), which gives an exhaustive review of the evidentiary status of declarations against penal interests. The principles governing such declarations were stated as follows:

> We begin with the principle that declarations against interest are admissible as exceptions to the rule against hearsay. A limitation is placed on that principle, exempting declarations against penal interest from the admissible category. The lat-

---

**1.** *See* Offutt v. State, 44 Md. App. 670, 677, 410 A.2d 611, 615 (1980); Lapelosa v. Cruze, 44 Md. App. 202, 206-07, 407 A.2d 786, 789 (1979).

ter-day exceptions to that limitation are that such declarations against penal interest will be admissible where there is "no evidence of collusion" and where the declaration is "not on its face *obviously untrustworthy."* [Emphasis supplied.] 45 Md. App. at 651.

The trial court found the alleged declaration by West against her penal interest to be untrustworthy and therefore inadmissible for three reasons: first, because West was available to testify at trial; secondly, because the statement was ambiguous; and third, because the alleged informant had never been identified. In addition, West took the stand at the suppression hearing and denied ever making such a statement. The Court of Appeals held in *Brady v. State,* 226 Md. 422, 174 A.2d 167 (1961) that the initial determination as to the trustworthiness of evidence must be made by the trial court.

In this case the trial court was asked to admit third or fourth level hearsay. The chain of individuals involved in the alleged hearsay was as follows: (1) Rochelle West purportedly made a confession to an unknown person; (2) the unknown person then told Officer Teidemann about West's statement; (3) Teidemann then reported this statement to Detective Brown; (4) Brown reduced this information to a written report and relayed it to the first investigator, Detective Willis, who then gave it to the acting investigator, Detective O'Brien. At trial, defense counsel argued that he should have been permitted to call Officer Teidemann to the stand to testify as to the alleged statement made to him by the unidentified informant. Had the officer been permitted to testify as to the alleged statement by West against her penal interest, the statement could not have been tested either by oath or cross-examination. In addition, the statement was not sufficiently identified with the murder of the victim. We conclude that the trial judge's dissatisfaction with the trustworthiness of the statement was adequately stated in his summation of his reasons for granting the State's motion:

But let's go one step further. What do we have in the statement? The law says that a confession by one other than the Defendant that he committed the crime in question — and I emphasize committed the crime in question — should be received and considered by the trier of the guilt of the accused unless also clearly conclusive, frivolous or otherwise untrustworthy.

Do we have a confession that the person committed the crime in question? At best, we have that someone came to someone else and the someone is allegedly Rochelle West and stated she had to get money and get out of town because she killed someone on Morley Street.

Now, we have got to infer that the address on Morley Street is the same address in the instant case and we've got to assume or infer or accept that the person she killed was in fact the person that was killed on that date or at that time. There's no date given, no time, no address and no person. So, we've got a question of who this Rochelle West killed if we accept the statement of this unknown person. Who she killed, when she killed them, where she killed them — Morley Street is a large street — and under what circumstances.

So, first of all, do we have a confession, and I don't think we have anything that relates to this case that a person says that they did commit the crime in question. The fact that she killed somebody and there's no question — or someone on a certain street, when, where, under what circumstances no one knows.

We have considered the sub parts of the arguments made in support of appellant's initial contentions in this case and find no merit in them.

## II.

We find no error in the trial court's ruling on the admissibility of the oral statements made by appellant to the Los Angeles police. It is clear from our review of the record that the initial statement made to Officer Enlow by appellant was not the result of an interrogation by the officer; rather, it was freely and voluntarily offered by the appellant. Likewise, the second statement in question made to Officer Greco while transporting appellant to the station was also a spontaneous utterance made freely and voluntarily by appellant. No interrogation was being conducted during the transportation. Appellant further contends that he was not advised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) until after the Los Angeles police had completed an interview card in which they obtained from appellant his name, address, date of birth and other statistical information. He suggests that the police were able to locate the *corpus delicti* of the crime because of the identification information solicited from appellant. In his view, this tainted the original statements offered by appellant to Officers Enlow and Greco. We do not agree.

It is clear to us that the statements made in California were not the result of custodial interrogation and were therefore admissible into evidence. The test was enunciated by the Supreme Court in *Miranda v. Arizona, supra,* and is stated as follows:

> ... the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. 384 U.S. at 444.

618

*See also Leuschner v. State,* 41 Md. App. 423, 397 A. 2d 622 (1979), *cert. denied,* 285 Md. 731 (1979), *cert. denied,* 444 U.S. 933 (1980), *reh. denied,* 444 U.S. 1027 (1980). The argument that the completion of the interview cards somehow tainted appellant's voluntary statements is without merit. We have held in Maryland that information obtained from routine identification questioning will not affect the admissibility of statements challenged under the *Miranda* exclusionary rule. *See Grimes v. State,* 44 Md. App. 580, 409 A.2d 767 (1980).

III.

One of the witnesses called by the State was Homicide Detective Leonard Willis, who had initially been assigned to this case. Detective Willis provided the foundation for the introduction of photographic evidence used in this case. In addition to foundation testimony, Willis expressed an opinion that from droplets of blood found at the scene, the victim had traveled from the front bedroom — the bedroom in which appellant testified he was sleeping — across the hall into the rear bedroom. Willis also testified that he found a suitcase containing male clothing and bedroom slippers in the house. In opposition to this testimony, appellant contended that the suitcase had been planted there by the police. Upon cross-examination the trial judge discovered that Willis had been acquainted with one of the jurors. After receiving that information, the court conducted a *voir dire* which disclosed that the juror had been an old schoolmate and neighbor of Detective Willis some fifteen years prior. The juror assured the court that this would not cause her to give Officer Willis' testimony any greater weight and that her ability to fairly and impartially judge the case would not be impeded. Upon receiving these assurances, the trial court refused to strike the juror and appellant contends that failure to do so amounted to reversible error. We do not agree.

The guidelines for granting a new trial where it has been discovered that a juror has made a misstatement during *voir*

*dire* examination are set out in *Burkett v. State,* 21 Md. App. 438, 319 A.2d 845 (1974), wherein we held:

> ... the grant of a new trial where information inadvertently is withheld by a juror's failure to respond to *voir dire* inquiry, should be left to the sound discretion of the trial judge unless:
>
> (a) actual prejudice to the accused is demonstrated, or
>
> (b) the withheld information, in and of itself, gives rise to a reasonable belief that prejudice or bias by the juror against the accused is likely. 21 Md. App. at 445.

We think the same guidelines apply where a mistrial is sought because of misinformation given by a prospective juror during *voir dire* proceedings. The *voir dire* conducted by the trial judge after the discovery of her acquaintance with the police officer satisfied the judge that the failure of the juror to disclose her acquaintance during the original *voir dire* was inadvertent and unintentional; that the relationship between the juror and the officer was minimal and had existed in the remote past; and that the juror could still render a fair and impartial verdict. Under the circumstances, we do not believe that the facts in this case would require a disqualification for cause of the juror during the original *voir dire;* nor do we find any abuse of discretion by the trial judge in refusing to strike the juror after the case had begun or to grant a mistrial. *See Mills v. State,* 12 Md. App. 449, 279 A.2d 473 (1971).

## IV.

Appellant next contends that on the fourth day of trial, after the State had rested its case, defense counsel advised the court that appellant had a stomachache and requested a continuance over the weekend. The court denied the request, and we find no reversible error. There is evidence in the record that later that day the prosecution requested a sus-

pension of cross-examination until the following day, defense counsel then advised the court that appellant "would rather go through the whole thing." It is well established that the allowance or denial of a continuance is within the sound discretion of the trial court and that a conviction will not be reversed on these grounds unless there has been a clear abuse of discretion. *See Avery v. State,* 15 Md. App. 520, 292 A.2d 728 (1972). In this case we find nothing in the record to suggest that, notwithstanding his stomachache, appellant's ability to testify on his own behalf or to cooperate with his counsel was impaired during the extended direct and cross-examination.

### V.

At trial, the State attempted to offer into evidence the police report filed by Los Angeles Police Officer Greco after Officer Greco had already testified on direct and cross-examination. Defense counsel vigorously objected and the State withdrew its offer of the report. Appellant contends that this amounted to prosecutorial misconduct because it caused the jury to believe that some important evidence was being withheld from them, and defense counsel moved for a mistrial. The State offered the report, the defense objected, and the State thereupon withdrew its offer. There is nothing in the sequence of these events which even remotely amounts to prosecutorial misconduct. We have held on numerous occasions that the granting of a mistrial rests solely within the discretion of the trial judge. The refusal to grant a mistrial should not be reversed unless it is clear that the failure to do so would result in prejudice to the moving party. *Smith v. Director, Patuxent Institution,* 27 Md. App. 618, 342 A.2d 334 (1975); *Baldwin v. State,* 5 Md. App. 22, 245 A.2d 98 (1968). We find no merit in appellant's contention that the State was guilty of prosecutorial misconduct in utilizing information covered by psychiatric privilege and, therefore, find no error in the trial judge's refusal to grant a mistrial.

## VI.

As a sixth ground for reversal, appellant contends that the trial judge erred in his refusal to give requested instructions as to the issues of malice and the weight to be given to police testimony. We find no error in these rulings. At the conclusion of the final jury instructions, defense counsel approached the bench and said, "[s]houldn't you have mentioned something about malice, Your Honor, in the charge with regard to murder?" Counsel then asked the court "to give them the definition that is necessary." The trial judge refused the request on the basis that his instruction adequately covered the definition of first degree murder. In this case the trial judge generally instructed the jury that:

> Murder in the first degree is the wilful, deliberate and premeditated killing of a human being without excuse, justification or mitigation.

The term "malice" has been defined in the context of murder as encompassing three distinct aspects. It denotes (1) that the act which produces the homicide is intentional; (2) that the act be without justification or excuse; and (3) that the act be unmitigated. *Evans v. State,* 28 Md. App. 640, 349 A.2d 300 (1975), *aff'd,* 278 Md. 197, 362 A.2d 629 (1976). However, before a trial judge is required to define specifically the terms "justification, excuse, or mitigation," there must be a legitimate jury issue as to those matters. *Evans, supra,* at 665. Appellant's defense was that he did not kill his mother-in-law but that she was killed in their home by an intruder. The judge made it clear in his instructions to the jury that in order to find the appellant guilty of first-degree murder, the homicide must have been intentional, willful, deliberate and premeditated. The existence of intent coupled with the other aforesaid elements is sufficient to establish malice (if believed by the jury).

As to the refusal of the trial judge to instruct the jury with respect to the weight to be given to the police testimony, our independent review of the record convinces us that the trial

court's detailed instructions as to the credibility of witnesses fairly covered the requested instruction.

## VII.

Appellant next contends that the trial court erred by permitting the jury to separate and return to their homes after they had started their deliberations. In Maryland, the law regarding the separation of the jury is governed by both statute and common law. Under Md. Cts. & Jud. Proc. Code Ann. Section 8-304, the separation of jurors in criminal cases rests with the discretion of the trial court:

> The jurors sworn to try a criminal act may, at any time *before the submission of the case to the jury,* in the discretion of the court, be permitted to separate or may be kept in charge of proper officers. [Emphasis supplied.]

The recent case of *Magwood v. State,* 46 Md. App. 668, 420 A.2d 1253 (1980), provides us with a similar factual situation. In *Magwood* we held that it was reversible error to permit a jury in a criminal case to be separated "after the issue has been submitted to them, and before verdict, unless the record affirmatively shows that the accused has personally waived the right to require the jury to be sequestered during its deliberative process." 46 Md. App. at 678.

In the instant case the jury retired to deliberate on March 31, 1980 at 12:30 p.m. At approximately 4:15 p.m. the court reconvened out of the presence of the jury to discuss with counsel a written question sent to the judge by the jury. The written question involved a portion of the record transcript. The question then arose as to whether the jury should be sequestered or permitted to return home until the court reporter located the requested testimony in the record. The following colloquy then ensued:

> [THE COURT:] We have gone through this scenario once with this case with a different jury and again at that time we agreed as of a certain time when we

began to read testimony and so forth to let the jury go home and bring them back the next day to give the stenographer a chance to find the testimony and read it to them. We went through that whole procedure last time.

Mr. Leach: I understand you have talked to your attorney again and it is perfectly agreeable to you to proceed in this same manner.

Is that correct?

[THE DEFENDANT:] Yes, sir.

This statement by the judge referred to the previous trial of the accused which resulted in a mistrial because the jury was unable to agree upon a verdict. The same trial judge presided over both cases. After the accused had agreed to proceed in the aforementioned manner, the trial judge said:

THE COURT: All right. Let the record show Mr. Leach is fully aware of his rights, that he can have the jury remain in the jury room until a late hour tonight and even sequestered at a hotel until tomorrow.

We have gone through that, but he is waiving his rights and he is requesting at this time that the Court allow the jury to go home to continue deliberations — Tomorrow is going to be a holiday for everybody here. So it will be Wednesday morning.

We find no case directly on point in which the Court of Appeals has had this issue before it, but we are convinced by our reading of *Kennard v. State,* 177 Md. 549, 10 A.2d 710 (1940), that the Court held by implication that a separation of a jury after it has begun its deliberations is permissible provided that the defendant is aware of his right to insist that the jury remains sequestered, and the defendant knowledgeably consents to his waiver of this right.[2] The record in

---

2. *Cf. Midgett v. State,* 223 Md. 282, 164 A.2d 526 (1960), where the Court of Appeals held that a failure to object at trial to the absence or sufficiency of an admonition to the jury but prior to submission amounted

this case discloses that the judge advised appellant of his right to have the jury remain sequestered and that he voluntarily acquiesced in their separation. As further evidence of appellant's knowledgeable waiver, the record reflects that before the jury was permitted to separate, the trial judge advised the jury (in the presence of appellant and his counsel) of the following:

> THE COURT: Madame Forelady and ladies and gentlemen of the jury, I have received your note here, which says, "Can someone read us portions of the defendant's testimony regarding why he gave himself up in California."
>
> I am going to have the stenographer start to go over that testimony and find what he said regarding that testimony. You don't want what the officer said. You want what he said. Is that correct? The answer is yes. Okay. I will get his testimony.
>
> Now, let me say this. The rules of procedure are generally that once a jury is in the jury box deliberating that they are sequestered which means they must be locked up in a room or sent to a hotel room and so forth and so on.
>
> You are in the middle of deliberations and from what I understand from this question you have not reached any final result in your deliberations at this time and the forelady is saying no. So you are still in the middle of deliberations.
>
> Now, it's been agreed with counsel rather than keep you locked up or send you to a hotel room and so forth, we are going to let you go home and come back and continue deliberations. Now, this is the thing. Tomorrow is going to be a holiday for many

---

to a waiver. *See also Jamison v. State,* 304 P.2d 371 (Okl. Cr. 1956) where it was held that the right to have the jury remain together after they had begun deliberations may be waived by consent. *In Mason v. State,* 239 Ga. 538, 238 S.E.2d 79 (1977), it was held that a jury could be separated in a capital case with the consent of the defendant. *In Tribe v. District Court in and for the County of Larimer,* 593 P.2d 1369 (Colo. 1979), it was held that in the absence of a valid waiver by the accused, a jury was required to be sequestered in a first-degree murder case.

of us and we will not be here which means you will not return here until Wednesday morning. All right?

The trial judge then gave a lengthy precautionary instruction to the jury in which he advised them that they must not discuss the case with anyone else, including each other. Furthermore, they were instructed to refrain from considering the case in their own minds until they resumed deliberations on the following Wednesday. There was no objection to the court's decision to permit the separation of the jury and there is no suggestion in the record that the jury disobeyed the judge's instructions; nor is there any evidence that appellant was prejudiced because of the separation of the jury. From our independent reading of the record, we are convinced that the appellant knew that he had a right to insist that the jury remain sequestered and that he knowingly waived that right and consented to the separation of the jury.

## VIII.

Appellant further contends that the trial court erred by permitting the court reporter to read unrequested portions of the transcript to the jury. He concedes that it is in the sole discretion of the trial judge to have portions of the transcript read to the jury when requested under Maryland Rule 758 c,[3] but contends that the portion of the record read to the jury amounts to an abuse of discretion. Appellant premises his argument upon the fact that the testimony read back to the jury included unrequested, irrelevant testimony as to collateral matters. The State urges that the judge properly exercised his discretion under Rule 758 c and that the disputed testimony read to the jury related to the same factual issue upon which the jury requested the information. We agree with the State and find no evidence of abuse of discretion.

---

**3.** See also Veney v. State, 251 Md. 182, 246 A.2d 568 (1968); Bing Fa Yuen v. State, 43 Md. App. 109, 403 A.2d 819 (1979).

## IX.

Appellant's final contention is that the evidence adduced at the trial was insufficient to sustain his conviction. The proper test for sufficiency of evidence was established by this Court in *Metz v. State,* 9 Md. App. 15, 262 A.2d 331 (1970), wherein we held:

> The test of the sufficiency of the evidence has been established as being whether the evidence either shows directly, or supports a rational inference of, the facts to be proved, from which the trier of fact could fairly be convinced beyond a reasonable doubt, of the defendant's guilt of the offense charged. 9 Md. App. at 20.

Without reciting the evidence, our independent review of the record convinces us that there was more than sufficient evidence to sustain the verdicts rendered by the jury.

*Judgment affirmed, costs to be paid
by appellant.*